**SO ORDERED.**

**SIGNED this 20 day of May, 2024.**



_____
**John T. Laney, III**
**United States Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **TRIMAX MEDICAL MANAGMENT, INC.** | ) ) | **CHAPTER 11 BANKRUPTCY** |
| | ) | |
| Debtor. | ) | **CASE NO. 23-51628-JTL** |
| | ) ) | |

**MEMORANDUM OPINION OF FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

The above-styled contested matter comes before the Court on objections to confirmation filed by Mr. David Field, "Creditor," and Ms. Jenny Walker, the Chapter 11 Subchapter V

1

Trustee, "Trustee," to the small-business reorganization plan filed by the Debtor, Trimax Medical Management, Inc., "Trimax" or "Debtor."

The Creditor objected stating that the Debtor's plan violates 11 U.S.C. §§ 1129(a)(3), (7) and 1191. The Trustee also objected to the Debtor's plan specifically as to the provisions allowing the Debtor to directly make its payments to creditors instead of through the Trustee. The Court finds that the Debtor carried its burden by meeting its requirements under §§ 1129 and 1191(b) and overrules the outstanding objections.

I.     FACTUAL FINDINGS AND PROCEDURAL POSTURE

Trimax operates as an expense sharing management company. Hr'g Held, Doc. 90. Trimax employs administrative professionals and provides managerial services for small businesses that cannot otherwise afford those services in-house. Hr'g Held, Doc. 90. The company then passes the expenses to its customers proportionally split by the amount the customers use those services.[1] Hr'g Held, Doc. 90. Trimax can make a profit by charging its customers a certain percentage of the expenses as an additional management fee but has reported losses since 2018. Hrg Held, Doc. 90; Debt.'s Ex. 24.

The Debtor is solely owned and operated by Dr. Hugh F. Smisson III. Hr'g Held, Doc. 90. Dr. Smisson also owns a majority of shares in both Southern Spine, LLC and Smisson-Cartledge Biomedical, LLC, "SCB." Debt.'s Exs. 1 and 3. Southern Spine and SCB are the two beneficiaries of Trimax's management services and are charged management fees according to the services they receive from Trimax. Debt.'s Ex. 9. Bass Capital Group, a real estate venture also owned by Dr. Smisson, also utilizes Trimax's services and is charged a management fee. Hr'g Held, Doc. 92. Other companies owned or controlled by Dr. Smisson have previously used

---

[1] Debtor's Exhibit 25 includes an illustrative breakdown of the Debtor's expense sharing system.

Trimax's services and have outstanding unpaid management fees. Hr'g Held, 91. Mr. Don Johnson, the comptroller of the Debtor, averred additional companies also owned by Dr. Smisson, including a wedding venue and realty company currently, utilize Trimax's services often without being charged for them. Hr'g Held, Doc. 92.

SCB owes Trimax over $2.7 million in unpaid management fees. Debt.'s Scheds., Doc. 40. Bass Capital Group has an outstanding account balance of $78,135.78 owed to Trimax. *Id*. Dr. Smisson's other companies, Veracon Biomedical, LLC, Tactical Fabrication, LLC, Smisson-Mathis Energy, LLC, and Hibernation Therapies, LLC, owe, in total, $840,348.17 in unpaid management fees to Trimax. *Id*. Trimax has determined the accounts receivable from Dr. Smisson's companies other than Bass Capital Group are uncollectable because the underlying companies owing the receivables are insolvent. Hr'g Held, Doc. 91. Southern Spine is current in its payments to Trimax and is prepaying its management fees to Trimax to ensure Trimax stays in business. Doc. 64, Ex. B.

The Creditor, David Field, previously served as the CEO of Trimax before his termination. Mr. Field obtained a judgment against Trimax for $1,029,799.88 for wrongful termination on November 9, 2023. Debt.'s Scheds., Doc. 40; Hr'g Held, Doc. 90. The Debtor filed its bankruptcy petition on November 20, 2023, shortly after Mr. Field received his judgment against it. The Debtor filed its Chapter 11 plan on February 20, 2024, which proposes to impair the claims of the general unsecured creditor's class, including Mr. Field's claim. Debt.'s Ch. 11 Plan, Doc. 64. The Creditor subsequently voted to reject the plan. Ch. 11 Ballot, Doc. 73.

Mr. Field filed an objection to confirmation of the plan on March 5, 2024. Cred.'s Obj. to Conf., Doc, 70. The Trustee also objected to the confirmation of the Debtor's Plan on April 3, 2024. Trustee's Obj. to Conf., Doc. 82. The Court heard testimony from Dr. Smisson, Mr.

3

Johnson, and Mr. Field, and heard the parties' arguments over three days of hearings culminating on May 13, 2024. Hr'g Held, Doc. 90; Hr'g Held, Doc. 91; Hr'g Held, Doc. 92; Hr'g Held, Doc. 96, Hr'g Held, Doc. 97, Hr'g Held, Doc. 98' Hr'g Held, Doc. 99. After closing arguments, the Court took the matter under advisement. Hr'g Held, Doc. 99.

## I. LEGAL ANALYSIS

The Creditor objected to the Debtor's plan under §§ 1129(a)(3) and (7). The parties did not dispute the other elements of § 1129, but the Debtor admitted that the plan does not satisfy §§ 1129(a)(8) and (10). Because the plan does not satisfy § 1129(a)(8) and (10), the Debtor's plan must meet the elements of § 1191(b), which the Creditor argues it does not. The Court finds that the Debtor met its burden as to the required elements of §§ 1129 and 1191(b) and confirms the Debtor's plan.

### a. The Creditor's Objection under § 1129(a)(3)

The Creditor first objected under § 1129(a)(3) claiming that the Debtor did not propose its plan in good faith. The initial matter the Court addresses is the standard of good faith under § 1129(a)(3). In their respective arguments, both the Creditor and Debtor cited the bad faith factors as outlined in *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394-95 (11th Cir. 1988). The Creditor also cited Judge Grabill's recent decision in *In re Who Dat?, Inc.,* 2024 WL 1337453 (Bankr. E.D. La. Mar. 27, 2024) to support his position that Court should not confirm the Debtor's plan.

The parties misplace their reliance on these cases. The standards used and decisions reached by the *Phoenix Piccadilly* and *Who Dat?* courts addressed different procedural postures than the case at bar. The court in *Phoenix Piccadilly* examined whether the debtor in that case filed its petition, not its plan, in bad faith. 849 F.2d at 1394-95. The court in *Who Dat?* addressed a creditor's motion to dismiss or, alternatively, convert as well as the creditor's objection to

4

confirmation when finding that the case should be dismissed. 2024 WL 1337453, at *4. The issue before this Court is only whether the Debtor filed its plan in good faith for purposes of confirmation under § 1129(a)(3). The Eleventh Circuit stated the required standard for finding good faith under §1129(a)(3), in *In re Seaside Engineering. & Surveying, Inc.*, as follows:

> "While the Bankruptcy Code does not define the term, courts have interpreted 'good faith' as requiring that there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code." *In re McCormick*, 49 F.3d 1524, 1526 (11th Cir.1995). Those purposes include preserving jobs in the community, allowing the business to continue to operate instead of liquidation, and achieving a consensual resolution between debtors and creditors. *In re United Marine, Inc.,* 197 B.R. 942, 947 (Bankr.S.D.Fla.1996). "Bad faith exists if there is no realistic possibility of reorganization and the debtor seeks merely to delay or frustrate efforts of secured creditors." *Id*. (citing *In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir.1984)).

780 F.3d 1070, 1082 (11th Cir. 2015). The Court, therefore, uses this standard to determine whether the Debtor proposed its plan in good faith.

The Creditor argues that the plan aims solely to benefit insiders, that the Debtor inappropriately included non-business-related expenses in its budget which, the Creditor claims, decreases the funds available for unsecured creditors, and the Debtor's purchase of a car for Mr. Johnson during its litigation with Mr. Fields, demonstrates bad faith. Hr'g Held, Doc. 90. The Court disagrees.

The Court first addresses the Creditor's argument that Trimax should collect money from the various insider-owned businesses that utilized its services but do not pay for them including Dr. Smisson's wedding venue and realty company. As stated previously, Trimax is a management company by which multiple companies share the expenses of bookkeeping services, payroll services, and other administrative costs. Hr'g Held, Doc. 90. The company charges the companies that employ its services the cost of the services plus, at times, a nominal profit percentage. *Id*. The costs of Trimax are borne currently only by Southern Spine and SCB and the

5

evidence shows that other companies owned by Dr. Smisson are using the Debtor's services without paying for them, unfairly benefiting from this arrangement. *Id*. This argument, while highlighting potentially problematic business practices, fails to demonstrate an injury to the Creditor so as to deny confirmation of the Debtor's plan. If Dr. Smisson's other companies paid a larger portion for the services they receive, the expenses would remain the same, just allocated to the companies differently, and the revenue to the company would not change. The Debtor will not receive additional income if it reallocates its expenses and the Debtor's revenue and disposable income would remain the same, leaving the same distribution for unsecured creditors. Thus, the Court finds that the Debtor's likelihood of achieving its planned reorganization is unaffected by the allocation of the Debtor's expenses to its various customers.

Similarly, the Creditor argues that the Debtor improperly employs Mr. Beauch when Mr. Beauch performs personal handyman services for Dr. Smisson. Under the Debtor's expense sharing model, the salary of Mr. Beauch is borne by Southern Spine and SCB. Debt.'s Ex. 25. Were Trimax to no longer employ Mr. Beauch, Trimax would simply no longer charge Southern Spine and SCB for his salary. Thus, removing Mr. Beauch's salary from the Debtor's budget would also not affect the Debtor's disposable income. In fact, decreasing the Debtor's expense would reduce the Debtor's disposable income for the life of its plan. The Debtor's budget includes an additional profit percentage charged to its customers that increases from one to three percent of the Debtor's expenses through the life of its plan. Debt.'s Ch. 11 Plan, Doc. 64, Ex. B. If Trimax's expenses decrease because it no longer employs Mr. Beauch, the amount from which Trimax's profit is calculated would also decrease. Therefore, the Creditor would recover less were Mr. Beauch's salary disallowed. The Court does not find that the inclusion of Mr. Beauch's

6

salary in the Debtor's proposed budget negatively affects its likelihood to achieve its planned reorganization and, instead, benefits its unsecured creditors.

The Creditor also argues that Trimax's purchase of a car for Mr. Johnson prior to bankruptcy demonstrates bad faith. The Creditor argues that, during the expensive litigation between Trimax and the Creditor, Trimax improperly purchased a car for Mr. Johnson with insufficient business justification. The business justification for Mr. Johnson's truck is irrelevant to the confirmation of the Debtor's plan. For confirmation, a Debtor must show "a reasonable likelihood that the plan will achieve a result consistent with the Bankruptcy Code. The showing is not determined by what a proponent's behavior was prior to the filing of the bankruptcy petition, but rather upon the proponent's post-petition actions." *Matter of Fiesta Homes of Georgia, Inc.,* 125 B.R. 321, 325 (Bankr. S.D. Ga. 1990). Thus, the inquiry into the Debtor's purchase of Mr. Johnson's truck prior to bankruptcy is irrelevant for purposes of § 1129(a)(3).

For the forgoing reasons, the Court finds Debtor proposed its plan in good faith and overrules the Debtor's objection under § 1129(a)(3).

### b. The Creditor's Objection under § 1129(a)(7)

The Court next addresses the Creditor's objection under § 1129(a)(7). Section 1129(a)(7) requires that classes of creditors which have not accepted the plan must receive, under the plan, "not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7." This requirement is otherwise known as the "best interest" test, meaning it must be in the creditor's best interest that the debtor reorganizes and does not liquidate. The Debtor supports its plan with a liquidation analysis in which it values the potential recovery of assets if the case converted to chapter 7. Debt.'s Ch. 11 Plan, Doc. 64, Ex. A. The Creditor argues the Debtor's plan does not meet the requirements of § 1129(a)(7) because the

Debtor undervalued the accounts receivable listed in its liquidation analysis it prepared in support of its plan. The Court disagrees.

As previously stated, SCB, a company also owned in part by Dr. Smisson, owes Trimax over $2.7 million in unpaid management fees. The Debtor has determined that, because SCB is currently insolvent, collection against its receivable would not profit the estate's unsecured creditors. Debt.'s Ch. 11 Plan, Doc. 64, Ex. A. Because SCB is an insider of the Debtor, more information is available to the Debtor about SCB's financial status than an arms-length creditor would have. Specifically, the Debtor presented evidence of SCB's recent balance sheets and available cash which demonstrate that, since at least 2019, SCB has been and continues to be insolvent. Debt.'s Ex. 20. Based on the evidence presented about SCB's current financial condition, the Court finds the Debtor's valuation of the SCB as $0.00 receivable appropriate.

SCB owns the patent for a rapid blood transfusion pump as well as its associated disposables and accessories. Hr'g Held, Doc. 92. Dr. Smisson testified that the Debtor successfully created the first-generation pumps but needs to update the pumps to continue to remain marketable. Hr'g Held, Doc. 92. To fund the development of the second generation of pumps, SCB has borrowed close to $4 million from Tenir, LLC. Hr'g Held, Doc. 92. Including this large loan, SCB's current liabilities total $8,644,434.17. Debt.'s Ex. 20. The Debtor reports its assets total $1,044,975.41. Debt's Ex. 20. The Debtor's asset figure includes only $18,132.26 in cash. *Id*.

The Debtor asserts and the evidence shows that SCB cannot currently pay any amount of its debt owed to Trimax. The Debtor averred that Tenir, LLC, owned Mr. Tracey Augustine who also owns Medical Solutions, Inc., the company that builds and sells SCB's pumps, has blanket liens on the SCB's property and the absolute power to convert this debt into preferred shares and

8

assume control of SCB. Hr'g Held, Doc 91. In response, the Creditor disputed the validity of the liens held by Tenir and Mr. Augustine, arguing that Tenir and the Debtor both have unsecured claims against SCB and the Debtor must attempt to collect its receivable against SCB to satisfy the best interest of the creditors. Hr'g Held, Doc. 98.

The Court makes no determination as to the validity of any lien held by Tenir or Mr. Augustine. Such determination is unnecessary due to the substantial evidence that litigation against SCB would be fruitless and potentially detrimental to the Debtor. The Creditor provided no evidence to contest the accuracy of SCB's balance sheet. The evidence demonstrates that SCB has no assets against which Trimax can collect. Debt.'s Ex. 20. SCB's indebtedness to Trimax is not a product of SCB's intentionally avoiding Trimax's specific debt, but of SCB's unfortunate business circumstances. Because SCB has no cash, the Debtor would be forced to sue SCB and attempt to collect from SCB's other assets. Litigation as to the validity of the other liens against SCB's assets including litigation against Tenir and Mr. Augustine would likely follow, which would cost the Debtor significant attorneys' fees and delay, if not prohibit, the Debtor from recovering. Furthermore, Mr. Johnson testified that, were Trimax to commence litigation against SCB, Tenir would likely exercise its right to take control of SCB and cease utilizing the services of Trimax, forcing Trimax to close. Hr'g Held, Doc 91.

The Creditor argues that SCB should be more profitable and better able to pay its receivable to Trimax. The Creditor first contends that SCB should be selling more pumps than it is currently selling. Hr'g Held, Doc. 98. Mr. Johnson testified that SCB can sell as many pumps as it can produce, but its production and inventory is slim. Hr'g Held, Doc. 97. Dr. Smisson also testified that SCB needs to update its product to remain marketable. Hr'g Held, Doc. 92. These issues limit SCB's current sales and income. The Creditor also stated that SCB should receive a

9

larger percentage of the sale price from its distributor. Hr'g Held, Doc. 97. This argument stems from the Creditor's misunderstanding of the sales agreement and failure to acknowledge the final sentences of the paragraphs outlining the division of sales proceeds for the pumps. Cred.'s Ex. 5.

While these arguments alone are unpersuasive to the Court, they are also irrelevant to the inquiry as to whether Debtor's plan meets the best interest of the creditors test in § 1129(a)(7). The Debtor cannot immediately make SCB more profitable to pay its receivable. The Debtor's determination that the debt owed to it is worthless for the purposes of liquidation is based on SCB's current financial position, not on hypothetical improvements to SCB's business that may improve SCB's finances. Thus, the Court does not find the Creditor's arguments about theories to potentially improve SCB's business circumstances persuasive as to deny confirmation of the Debtor's plan under § 1129(a)(7).

The Creditor also argues that the Debtor undervalued the receivable owed to the Debtor by Bass Capital Group. Mr. Johnson testified that, unlike SCB, Bass Capital Group is a solvent entity, but it is illiquid. Bass Capital Group holds real estate but does not have any current sale contracts which would infuse Bass Capital Group with the cash to pay its current debt to Trimax. The Debtor proposed that the liquidation value of the receivable is worth $54,695.05 less $18,049.37 in fees for a Chapter 7 Trustee or $36,645.68. Debt.'s Ch. 11 Plan, Doc. 64, Ex. A. Dr. Smisson has offered to purchase the receivable from Trimax for that amount. Hr'g Held, Doc. 92. The Creditor argues that the receivable is worth more than the Debtor assigned as its liquidation value. When asked by his own counsel how much the Creditor himself would pay for the receivable, however, the Creditor stated he valued it at $5,000, over $30,000 less than what Dr. Smisson offered to pay for it under the plan. Hr'g Held, Doc. 98. Thus, the Creditor's

testimony demonstrates that the Debtor did not undervalue the Bass Capital Group receivable for purposes of liquidation.

The Creditor also argues that the Debtor also undervalued the other receivables that it is owed. The Debtor lists receivables from "SME," "Hibernation Therapeutics," "Veracon," and "Tactical Fab" all with fair market values of $0.00. Debt.'s Ch. 11 Plan, Doc. 64, Ex. A. Mr. Johnson testified that those companies are either out of business or otherwise insolvent and pursuing those receivables would not lead to increased value to the estate. Hr'g Held, 91. The Creditor did not present any evidence disputing Mr. Johnson's testimony as to these receivables. The Court, therefore, finds that the Debtor adequately supported its decision not to collect these other receivables.

The Court finds that the Debtor accurately assessed the liquidation value of its accounts receivable and demonstrated its proposed plan meets the best interests of the creditors test. Thus, the Court overrules the Debtor's objection under § 1129(a)(7).

    c.    **The Creditors Objection under § 1191(b)**

The parties do not dispute that the plan does not comply with §§ 1129(a)(8) and (10) of the Bankruptcy Code. Because the Debtor filed under Chapter 11 Subchapter V, however, the plan need not comply with §§ 1129(a)(8) and (10) if it complies with § 1191(b). Section 1191(b) requires that the plan "not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." Only the Creditor, as the Debtor's largest unsecured creditor, is both impaired and has not accepted the plan. Thus, the Court must determine whether the plan is unfairly discriminatory and fair and equitable as to the Creditor's claim. The Court finds that the Debtor's plan satisfies § 1191(b).

The Court first addresses whether the plan unfairly discriminates against the Debtor's claim. The Creditor claims that the Debtor's plan is "self-serving" and not a "real reorganization." Hr'g Held, Doc. 99. While the plan does not provide for a large dividend to unsecured creditors, the Debtor's budget demonstrates that it will reorganize from an entity that has not made a profit since at least 2018 to a profitable entity under its plan. Debt.'s Ch. 11 Plan, Doc. 64, Ex. B. The Creditor argues that the dividend provided for unsecured creditors by the Debtor demonstrates that the Debtor made no attempt to provide for the Creditor's claim. *Id*. Small dividend payments, while unfortunate for creditors, are not uncommon in bankruptcy cases and not indicative of unfair discrimination. The Creditor also argues that Dr. Smisson owns the companies that stand to benefit from Trimax's decision not to pursue its accounts receivable. *Id*. The Court agrees that Trimax's insiders benefit under the plan and that these benefits should be viewed with significant scrutiny, especially the decision not to pursue the debt owed by SCB to the Debtor. The Court, however, finds, after the substantial testimony about SCB and the other insider-owned businesses, that the Debtor carried its burden to prove that collecting on these accounts receivable would not provide value to the estate. Southern Spine, an insider of the Debtor, also has a general unsecured claim against the Debtor for prepaid management fees paid prepetition that will be repaid at the same discounted rate as the Creditor's claim under the plan. Hr'g Held, Doc. 91. The Debtor's plan, while unfortunate for the Creditor, is not unfairly discriminatory against his claim.

The Court then addresses the Creditor's contention that the Debtor's plan is not fair and equitable. Section 1191(c)(2) provides, "[f]or purposes of this section, the condition that a plan be fair and equitable with respect to each class of claims or interests includes [that]… the plan provides that all of the projected disposable income of the debtor… will be applied to make

12

payments under the plan." The Debtor provided a budget for its operations under the plan which applies all the Debtor's projected disposable income to payments. Debt.'s Ex 7. The Creditor raised questions as to the reasonableness of the Debtor's expenses listed on the budget including the need for key person insurance and a line item for conferences and seminars. Hr'g Held, Doc. 92. The Debtor testified that the expenses on the Debtor's budget are passed to the customers of Trimax and not borne by the Debtor, so any expenses removed from the budget would reduce the Debtor's revenue by the same amount and would not affect the Debtor's projected disposable income. *Id*. As previously noted, the Debtor plans to charge its customers an additional percentage of the Debtor's expenses as a profit. Debt.'s Ex 7. Removing expenses from the Debtor's budget would reduce the amount by which the Debtor's profit percentage is calculated, reducing the Debtor's income and the Creditor's potential recovery. The Court finds that the Debtor's plan complies with the definition of fair and equitable stated in § 1191(c)(2). Thus, because the plan does not unfairly discriminate against the Creditor's claim and complies with the definition of fair and equitable under § 1191(c)(2), the Court finds the Debtor's plan complies with § 1191(b).

### d. The Trustee's Objection to the Debtor's Plan

The Trustee filed an objection to the Debtor's plan, objecting specifically to the distribution mechanisms outlined in section III subparagraphs 4 and 10 and section V. Trustee's Obj. To Conf., Doc. 82. The Trustee announced to the Court that she had reached an agreement with the Debtor as to the distribution of the plan's proceeds. Hr'g Held, Doc. 99. The Debtor and the Trustee agreed that the Debtor will continue to directly pay its secured creditors while the Trustee will manage the distributions to unsecured creditors. *Id*. The Debtor neither affirmed nor denied the agreement on the record, but the Court interprets the Debtor's lack of objection to the

Trustee's announcement as assent to the agreement. *Id*. The Court approves the agreement resolving the Trustee's objection as announced in the final hearing. The Trustee also objected to section XII but did not present evidence or argument as to this objection, therefore the Court overrules the Trustee's objection as to section XII.

## II. CONCLUSION

The Court overrules the Debtor's objections under §§ 1129(a)(3), (7), and 1191(b). The Court also accepts the agreement between Debtor and Trustee as announced on the record and overrules her outstanding objection. The Court furthermore finds that Debtor met its burden under §§ 1129 and 1191(b) and the Court approves its plan for confirmation.